In re the PATERNITY OF
Maria E. DURAN.

Baltasar Regalado, Appellant–
Intervenor,

v.

Maria E. Duran, Appellee–Petitioner,

and

First National Bank of Valparaiso, As Personal Representative of the Estate of Joseph Regalado, Deceased, Appellee–Respondent.

In re the Matter of the Estate of Joseph Regalado, Deceased.

Maria E. Duran, Appellant,

v.

Baltasar Regalado and First National Bank of Valparaiso, As Personal Representative of the Estate of Joseph

Regalado, Deceased, Appellees.[1]

No. 64A03–0702–JV–66.

Court of Appeals of Indiana.

Jan. 30, 2009.

---

1. Maria Duran and Baltasar Regalado each petitioned the trial court to determine heirship of Joseph Regalado's estate. On July 3, 2007, Judge William Alexa "ordered, adjudged, and decreed that Maria Duran is not an heir of Joseph James Regalado, deceased, and is not entitled to inherit from his estate by virtue of his death." *Maria's Estate App.* at. 61. Duran appeals from this determination.

Stephanie Shappell Katich, Nick Katich, Katich & Shappell Legal Team, LLP, Crown Point, IN, Attorneys for Baltasar Regalado.

Shawn P. Ryan, South Bend, IN, for Maria E. Duran.

Hugo E. Martz, Martz & Boyles, Valparaiso, IN, for First National Bank of Valparaiso.

## OPINION

KIRSCH, Judge.

This case represents the consolidation of two causes of action pertaining to Joseph Regalado ("Joseph"). The first, a paternity action,[2] is an appeal by Joseph's father, Baltasar Regalado ("Baltasar"), of the trial court's order that he could not intervene in the paternity action, which resulted in the determination that Joseph is the biological father of Maria E. Duran ("Duran"). The second, an estate action,[3] is Duran's interlocutory appeal of the trial court's determi-

---

2. The paternity action in the Porter Circuit Court, over which Judge Mary Harper and Magistrate Edward Nemeth presided, was Cause No. 64C01–0410–JP–1026. The cause number of that case on appeal was, and continues to be, Cause No. 64A03–0702–JV–66.

3. The estate action in the Porter Superior Court was docketed under Cause No. 64D02–0410–ES–9659 and was presided over by Judge William Alexa and Magistrate Katherine Forbes. Prior to being consolidated with the paternity action, this appeal was docketed in our court as Cause No. 64A04–0711–CV–638.

nation that, pursuant to Indiana Code section 29–1–2–8, she is not entitled to inherit by means of intestate succession from Joseph's estate. On its own motion, this court consolidated these two cases into the paternity action. On appeal, Duran raises a number of estate issues, which we consolidate and restate as follows:

I.  Whether the trial court abused its discretion in determining that Indiana law applies to the administration of Joseph's estate.

II.  Whether the trial court erred in determining that Duran is not Joseph's heir under the laws of intestacy.

Baltasar also raises a number of issues of which we find the following restated issue to be dispositive:

III.  Whether the trial court erred in denying Baltasar's motion to intervene in the paternity case.[4]

We affirm the decisions of the two trial courts.

## FACTS AND PROCEDURAL HISTORY

On January 15, 1985, Duran was born to Maria I. Duran ("Maria") out of wedlock. Two years later, Maria passed away. When Duran was almost three years old, her maternal grandparents, Teodoro and Rachel Duran, filed a petition in Cook County, Illinois to adopt Duran. Joseph, who at that time lived in Illinois, received personal notice of the adoption proceedings that named him as the putative fa-

ther. When Joseph failed to file an appearance or an answer in the adoption proceedings, the trial court issued a Default Order terminating his parental rights.

Thereafter, on December 11, 1987, the Cook Circuit Court entered a Judgment Order for Adoption of Duran. The Order noted that Joseph's consent to the adoption was not necessary because Joseph, as the putative father, was of lawful age, under no legal disability, had abandoned Duran more than three months prior to the petition for adoption, and had failed to maintain a reasonable degree of interest, concern, or responsibility as to Duran's welfare. The Order further provided:

> [Duran], a minor, shall be to all legal intents and purposes, the child of the Petitioners, TEODORO A. DURAN and RACHEL DURAN, husband and wife, and for the purposes of inheritance and all other legal incidents and consequences, shall be the same as if she had been born to the Petitioners in lawful wedlock.

*Duran's Estate App.* at 316.[5] The Illinois Office of the Cook County Clerk issued Duran a new birth certificate, which named Teodoro and Rachel Duran as her legal father and mother.

In 1991, Joseph suffered serious and permanent brain damage as the result of an altercation with officers of the Chicago Police Department. Thereafter, Joseph was adjudicated a disabled person, and an

---

4.  Baltasar also raises the issue of whether the trial court erred in denying his motion to dismiss after finding that the paternity action was timely filed. Finding, as we do, that the trial court did not abuse its discretion in denying Baltasar's motion to intervene, we need not address this issue.

5.  The parties filed separate briefs and appendices for the estate action and for the paterni-

ty action. Prior to the consolidation of the cases, Duran was the Appellant in the estate action and Appellee in the paternity action. For clarity, we will not refer to *Appellant's Br.* or *Appellee's App.* but, instead, will refer to each brief and appendix by the party's name and by the type of action, e.g., *Duran's Paternity Br.* or *Baltasar's Estate App.*

Illinois guardianship estate was opened in Cook County, Illinois for his care. An Indiana guardianship was also later established. Joseph's father, Baltasar, served as the guardian of Joseph's person in both Indiana and Illinois.

Baltasar, on Joseph's behalf, brought a federal lawsuit against the City of Chicago for the actions of its police officers. In December 2000, Joseph settled his claim for fifteen million dollars. At some point in 2004, Baltasar and Joseph moved to Porter County, Indiana, where, by Duran's own admission, Joseph was "domiciled" when he died on October 23, 2004. *Duran Estate App.* at 62. At the time of his death, Joseph owned no real property, but had eight to nine million dollars of personal property, which was located in Indiana.

As a young child, Duran believed that her biological father was dead. In 2000, Duran learned that Joseph, her putative father, was still alive, and she and her maternal aunt set up a meeting with Joseph's family. The meeting initially took place at a Denny's restaurant in Illinois. From that location, Joseph's mother invited Duran to the Hickory Hills, Illinois home where Joseph and his parents lived.

In October 2003, Duran filed, in Illinois, a petition to establish paternity in, and a petition for DNA testing of, Joseph as her putative father. Baltasar, in the capacity as Joseph's father and guardian, filed a motion to dismiss the petition. That motion was denied, and on May 12, 2004, a judge for the Cook County Circuit Court entered a Memorandum Opinion Order setting forth the reasoning as follows:

> [Duran's] argument propounds her right to establish relationship [sic] with [Joseph], assuming an adjudication of parentage, prior to his or her death, which might be allowed in that event. Under the [Illinois] Parentage Act, [Duran] claims a right to more than a material inheritance, but also the right to enjoy the parent/child relationship.
>
> Accordingly, absent any additional facts or statutory preclusions, this Court finds that since the action is timely and not barred by the statute of limitations, the adult-child may seek to establish paternity. This Court did not find any case law indicating her adoption under these facts would bar her from doing so, and for the foregoing reasons, she should be given the opportunity to establish and enjoy the parent/child relationship.

*Duran's Paternity App.* at 153.

Joseph died in Porter County on October 23, 2004. The next day, the Circuit Court of Cook County dismissed the paternity action after finding it no longer had subject matter jurisdiction over the case. A few days later, the parties commenced estate and paternity proceedings in Porter County, Indiana. While Porter County was the venue for all future proceedings, the paternity and estate issues were divided between two courts. The paternity issue was filed with the Juvenile Division of the Porter Circuit Court and heard by Magistrate Edward Nemeth and Judge Mary Harper. The estate issue, by contrast, was filed with the Porter Superior Court and heard by Magistrate Katherine Forbes and Judge William Alexa.

The Indiana paternity action commenced on October 26, 2004, when Duran, then nineteen years of age, filed a petition to conduct DNA tests and a second petition to establish parent and child relationship with Joseph. In May 2005, Baltasar filed a motion to dismiss the paternity petition on the basis that the action was not timely filed since service of process—the final step in filing an action—had not been made on the personal representative within the required five months after Joseph's death.

The First National Bank of Valparaiso (the "Bank"), which was named personal representative of Joseph's estate after May 2005, received a summons on the paternity action in August 2005. On September 28, 2005, the Bank filed a response to the paternity petition in which it stated that its only duty was to collect assets and to make distributions in accordance with applicable law. As such, the Bank stated that it took no position on the issue of the paternity petition.

On September 28, 2005, Baltasar filed a motion to intervene in the paternity action, asserting that the determination that Joseph was Duran's biological father could affect his status as an heir to Joseph's multi-million-dollar estate. On November 16, 2005, the trial court entered an order denying both Baltasar's motion to intervene and his motion to dismiss the paternity action. In an additional order, dated April 21, 2006, the trial court reasoned that Baltasar's interest in the paternity action was "indirect and derivative" and there were not sufficient grounds for intervention. The trial court also determined that Baltasar did not have standing to challenge the paternity action. *Id.* at 12.

Duran tried the paternity action before the Porter Circuit Court on September 7, 2006, without any opposition or evidence from either the Bank, which claimed it was a disinterested party, or from Baltasar, because the trial court had denied his motion to intervene. In an order dated January 10, 2007, the trial court granted Duran's paternity petition and declared, "Joseph ... is the biological father of the minor child Maria E. Duran born on January 15, 1985." *Baltasar's Paternity App.* at 22. Baltasar now appeals the trial court's denial of his motion to intervene in the paternity action.

Turning now to the estate action, which had been proceeding concurrently with the paternity action, on October 26, 2004, Duran filed a petition with the Porter Superior Court requesting that she be appointed personal representative of Joseph's "intestate-supervised" estate. *Duran's Estate App.* at 62. That same day, Baltasar also filed a petition to be appointed administrator of the estate. On October 27, 2004, the trial court denied both petitions, citing to existing conflicts between Duran and Baltasar. Instead, the trial court provided the names of three proposed personal representatives and ordered the parties to exercise alternating strikes in order to find a mutually agreeable personal representative. As stated above, the Bank ultimately was named personal representative.

Baltasar filed a motion with the Superior Court, requesting the court to reconsider its decision denying Baltasar's appointment as personal representative of Joseph's estate. In her response, Duran urged the trial court to "[a]pply Illinois probate law or strike the proceedings in Indiana." *Duran's Estate App.* at 83. During an evidentiary hearing conducted in February and May 2005, Duran's attorney presented evidence that Joseph had spent essentially all of his life in Illinois. Thereafter, Duran and Baltasar filed briefs concerning whether the Indiana court had subject matter jurisdiction over the estate. The trial court entered an order, dated June 30, 2005, which provided:

> This matter comes before the Court on *Maria Duran's Motion to Dismiss matter due [to] lack of jurisdiction.* Baltasar Regalado is present in Court in person with counsel ... and Maria Duran is present in Court with counsel. ... Witnesses are sworn, evidence is heard and concluded and this Court's Magistrate having taken this matter under advisement does hereby enter the following Findings and Recommendations:

1. That this Court finds that at the time of his death in October of 2004 Joseph James Regalado's residence and domicile was the State of Indiana, County of Porter. Additionally, all of the decedent's assets are located in the State of Indiana, County of Porter.

2. That this Court has subject matter jurisdiction over the Estate of Joseph James Regalado and, therefore, denies Maria Duran's challenge to this Court's jurisdiction.

3. That this Court has previously Ordered that a financial institution be appointed to serve as Personal Representative of the Estate of Joseph James Regalado and named a panel. The Court reaffirms this Order and parties shall strike accordingly.

*Duran's Estate App.* at 300 (emphasis added). Duran did not appeal this order.

On May 13, 2005, while the jurisdiction issues were being considered, Duran filed a petition with the Porter Superior Court for a determination that she was Joseph's sole heir. Seven months later, Baltasar filed a petition with the trial court for a determination that Duran was not Joseph's heir. After the matter was fully briefed by both sides and a hearing was held, the trial court issued its order of July 3, 2007, determining that Duran was not entitled to inherit from Joseph's estate. Thereafter, Duran requested that the trial court certify the heirship issue for an interlocutory appeal. The trial court did so, and, upon further petition, this court accepted the appeal.

## DISCUSSION AND DECISION

### I. Choice of Law

Duran contends that the trial court erred in applying Indiana law to the estate issues in this case where the parties had significant ties to Illinois. Citing to *Simon v. United States*, 805 N.E.2d 798, 805 (Ind. 2004), Duran argues that, like a tort case where *lex loci delicti* (the law of the place of the wrong) determines the choice of law, here, the trial court should have applied Illinois law (the law of the place where Joseph spent the majority of his life). *Duran's Estate Br.* at 15. Duran asserts: Joseph resided "his entire life when competent" in Illinois; Joseph was injured in Illinois by Chicago police and continued to live in Illinois after his injury; Baltasar placed Joseph under guardianship in Illinois after his injury; Baltasar paid Illinois payroll taxes for Joseph's caregivers; and the fifteen million dollar settlement was awarded while Joseph was an Illinois resident. *Id.*

While the parties agree that a significant amount of Joseph's life was spent in Illinois, *lex loci delicti* is not a relevant concept for the trial court's determination of whether to apply Indiana law in an estate action. "Under the weight of authority ... the right of inheritance of realty ... [is governed] by the law of the situs of the realty and the right of inheritance by the law of decedent's domicile." 4 DANIEL R. GORDON ET AL., HENRY'S INDIANA PROBATE LAW AND PRACTICE § 28.13 at 28-126 (2004) (hereinafter "*Henry's Indiana Probate*").

Finding no evidence in the record before us that Joseph owned any real estate, we conclude that all of his assets were personal property. *See Montgomery v. Estate of Montgomery*, 677 N.E.2d 571, 572 (Ind.Ct. App.1997) (personal property consisted of furniture and household goods, bank account, automobile, jewelry, and other miscellaneous personalty). "Personal property has no visible locality, but is subject to the law that governs the person of the owner [When such owner die s] it is not the law of the country in which the proper-

ty is but the law of the country of which he is subject that will regulate the disposition of such property." *Henry's Indiana Probate* § 28.01 at 28–6.

■ The issue of domicile was addressed in the early stages of Joseph's Indiana estate proceedings. After the trial court denied Baltasar's motion to be appointed as personal representative of Joseph's estate, Baltasar filed a motion to reconsider the trial court's decision. On November 12, 2004, Duran filed a response to Baltasar's motion and argued: (1) Baltasar was not qualified to act as personal representative; and (2) under choice of law and venue considerations, Illinois law and Illinois courts should control this estate. *Duran's Estate App.* at 76–84. The trial court held a hearing in February and May 2005, during which Duran argued that Illinois was the site of significant events in Joseph's life. Following the hearing, Duran filed a brief in support of the trial court's *lack* of jurisdiction, and Baltasar filed a brief in support of the trial court *possessing* jurisdiction. On June 30, 2005, the trial court entered an order denying Duran's challenge to the trial court having jurisdiction on the basis that: (1) Joseph's "residence and domicile was the State of Indiana, County of Porter"; (2) "all of [Joseph's] assets are located in the State of Indiana, County of Porter." *Id.* at 300. Duran did not appeal that order.[6]

Moreover, the estate venue laws of Indiana and Illinois reveal that those states consider comparable factors when determining where an estate should be administered. Indiana Code section 29–1–7–1, in pertinent part, provides:

(a) The venue . . . for the administration of an estate shall be:

(1) In the county in this state where the decedent had his domicile at the time of his death.

(2) When not domiciled in this state in any county in the state, where he left any property at the time of his decease; or into which county any property belonging to his estate may have come after his decease.

. . .

Similarly, 755 Ill. Comp. Stat. 5/5–1 (West 2007), in pertinent part, provides:

[W]hen the estate of a decedent . . . is administered in this State, the probate or the administration shall be in the court of the county determined as follows:

(a) In the county where he has a known place of residence;

(b) If he has no known place of residence in this State, in the county in which the greater part of his real estate is located at the time of his death; or

(c) If he has no known place of residence and no real estate in this State, in the county where the greater part of his personal estate is located at the time of his death.

Under both Indiana and Illinois law, the place to administer an estate is determined by the place where the decedent was domiciled or the location of the decedent's property.

Here, there was no actual choice of law issue to be debated. Indeed, Indiana was the only place that Joseph had a residence, was domiciled at his death, and had prop-

---

**6.** In an order dated July 3, 2007, the estate court concluded, "Since this court previously determined that Joseph was domiciled in the State of Indiana at the time of his death, that he died intestate, and that all of his assets were located in the State of Indiana, the distribution of his estate is governed by the intestacy laws of the State of Indiana." *Duran's Estate App.* at 55.

*erty.* Indiana was the appropriate place and the appropriate law for the administration of Joseph's estate.

## II. Duran as Heir to Joseph's Estate

### A. Standard of Review

■ In her interlocutory appeal of the estate court's Order Determining Heirship, Duran contends that the trial court erred in determining that Duran is not Joseph's heir under the Indiana laws of intestacy. We generally review interlocutory orders under an abuse of discretion standard. *In re Estate of Long*, 804 N.E.2d 1176, 1178 (Ind.Ct.App.2004); *Hollingsworth v. Key Benefit Adm'rs, Inc.*, 658 N.E.2d 653, 655 (Ind.Ct.App.1995), *trans. denied.* " 'An abuse of discretion may occur if the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court, or if the trial court has misinterpreted the law.' " *In re Estate of Long*, 804 N.E.2d at 1178 (quoting *Hollingsworth*, 658 N.E.2d at 655 (internal citation omitted)).

Here, we address whether the trial court correctly determined that Duran was not entitled to inherit from Joseph's estate pursuant to Indiana Code section 29–1–2–8. In deciding questions of statutory interpretation, appellate courts need not defer to a trial court's interpretation of the statute's meaning. *Johnson v. Morgan*, 871 N.E.2d 1050, 1052 (Ind.Ct.App.2007) (citing *Elmer Buchta Trucking, Inc. v. Stanley*, 744 N.E.2d 939, 942 (Ind.2001)). Rather, we independently review the statute's meaning and apply it to the facts of the case under review. *Id.* at 1052–53. The goal of statutory construction is to determine, give effect to, and implement the intent of the General Assembly. *Sanders v. Bd. of Comm'rs of Brown County*, 892 N.E.2d 1249, 1252 (Ind.Ct.App.2008). The legislature is presumed to have intended the language used in the statute to be applied logically and not to bring about an unjust or absurd result. *Id.* To determine legislative intent, we read the sections of an act together so that no part is rendered meaningless if it can be harmonized with the remainder of the statute. *Id.* (citing *City of N. Vernon v. Jennings Nw. Reg'l Utils.*, 829 N.E.2d 1, 4 (Ind.2005)). When the language in a statute is ambiguous or uncertain, we may look not only to the language, but also to the nature and subject matter of the act and the object to be accomplished thereby in ascertaining the legislative intent. *Johnson*, 871 N.E.2d at 1053.

### B. Intestate Succession

■ The laws of intestate succession are a legislatively created substitute for individual wills. 26B C.J.S. *Descent and Distribution* § 5 (2001). The right to succeed to the property of an intestate is not an inherent right, but is merely a creature of the law granted out of consideration of public policy. *Earle v. Indiana National Bank of Indianapolis*, 246 Ind. 251, 253, 204 N.E.2d 652, 654 (1965). The legislature has the authority, by appropriate legislation, to regulate and control the devolution of property within the borders of the State. *See Scott v. Scott*, 238 Ind. 474, 485, 150 N.E.2d 740, 745 (1958) (law applicable at date of ancestor's death determines devolution of intestate property). Thus "[i]t is within the province of the legislature to determine the rules of inheritance." *Earle*, 246 Ind. at 253, 204 N.E.2d at 654.

### C. Indiana Code Section 29–1–2–8

Both parties agree that Indiana Code section 29–1–2–8 governs the intestate inheritance of an adopted child like Duran.[7] *Duran's Estate Br.* at 8; *Baltasar's Estate Br.* at 6. We observe that section eight has three distinct yet interrelated concepts.

---

7. Although Duran qualifies as a person born out of wedlock, which suggests the applica-

For all purposes of intestate succession, including succession by, through, or from a person, both lineal and collateral, an adopted child shall be treated as a natural child of the child's adopting parents, and the child shall cease to be treated as a child of the natural parents and of any previous adopting parents. However, if a natural parent of a child born in or out of wedlock marries the adopting parent, the adopted child shall inherit from the child's natural parent as though the child had not been adopted, and from the child's adoptive parent as though the child were the natural child. In addition, if a person who is related to a child within the sixth degree adopts such child, such child shall upon the occasion of each death in the child's family have the right of inheritance through the child's natural parents or adopting parents, whichever is greater in value in each case.

Ind.Code § 29–1–2–8.[8]

■■■ The first sentence sets forth the enacting part of the statute regarding intestate inheritance by an adopted child. This is the general rule pertaining to the treatment of adopted children for purposes of intestate succession. The history of Indiana Code section 29–1–2–8 reveals that sentences two and three are in fact provisos to the first sentence.[9] As a rule, "the object of a proviso is to except something from the enacting part of the statute, or to waive or restrain its generality." *Merimee v. Brumfield*, 397 N.E.2d 315, 318 (Ind.Ct.App.1979). Traditionally, a proviso is not to be extended by construction, but is to be strictly limited to the objects fairly within its terms. *Id.* (citing *State ex rel. Bateman v. Hart*, 181 Ind. 592, 105 N.E. 149 (1914)). A proviso must be read and considered in connection with the section of which it is a part. *Id.* (citing *Hasse v. Bielefeld, Treas.*, 197 Ind. 498, 150 N.E. 413 (1926)).

## D. Implications of Adoption

The parties agree that since Duran was adopted by her maternal grandparents,

---

tion of Indiana Code section 29–1–2–7, and as a person who has been adopted, which suggests the application of Indiana Code section 29–1–2–8, we agree that the latter section applies. Under Henry's Indiana Probate, the question was posed: "Suppose the deceased had an illegitimate child by a woman he later married and [he] adopted the child legally ... would such child take as an illegitimate child under Indiana Code Section 29–1–2–7, or as an adopted child under Indiana Code Section 29–1–2–8?" Henry's Probate "submitted that such a child shall be adopted for the purpose of Indiana Code Section 29–1–2–8...." *Henry's Indiana Probate* § 28.09 at 28–56.

8. The Probate Code was enacted in 1953, with an effective date of January 1, 1954. Burns § 6–208 was the predecessor to Indiana Code section 29–1–2–8.

9. In 1969, Burns § 6–208, the predecessor to Indiana Code section 29–1–2–8, read in pertinent part as follows:

> For all purposes of intestate succession, including succession by, though or from a person both lineal and collateral, an adopted child shall be treated as a natural child of his adopting parents; and he shall cease to be treated as a child of his parents and of any previous adopting parents: *Provided, ...*; and *Provided further*, That if a person who is related to a child within the sixth degree adopts such child, such child shall upon the occasion of each death in his family have the right of inheritance through his natural parents or adopting parents, whichever is greater in value in each case.

Pub.L. 405–1969, § 2. While a 1987 amendment to Indiana Code section 29–1–2–8 removed the words "provided" and "provided further," the changes were deemed to be "nonsubstantive changes," and sentences two and three remained as provisos to the general rule. *See* Historical and Statutory Notes, I.C. 29–1–2–8.

who are related to her within the sixth degree, the third sentence (i.e., the second proviso) of Indiana Code section 29–1–2–8 may apply. They disagree, however, as to the interpretation of this language. Specifically, Duran cites to errors in conclusions 16 and 17 of the estate court's July 3, 2007 order, which read as follows:

16. Pursuant to the third sentence of IC 29–1–2–8, on the occasion of each death in Duran's family (i.e. her adoptive family), Duran can inherit *through* her natural mother or *through* her adoptive parent, whichever is greater in value in each case, and by virtue of the first sentence of IC 29–1–2–8, she can inherit *from* her adoptive parents.

17. The third sentence of IC 29–1–2–8 only applies to inheritance as a result of a death in the adopted child's adoptive family. It does not allow for inheritance *from* the natural parent who is also a member of the adoptive family but only *through* a natural parent who is a member of the adoptive family.

*Duran's Estate App.* at 58 (emphasis in original).

Duran first argues that the trial court erred when it limited her right to "inherit through her natural mother because she happened to be adopted by that side of her family." *Duran's Estate Br.* at 9. This, she offers, reads "less into the statute than what is there." *Id.* Noting that the statute itself speaks in the plural of inheriting through natural parents or adopting parents, Duran offers that her adoption by her maternal grandparents should not defeat her ability to inherit through her natural father as well as her natural mother. Further, Duran asserts that the legislature's reference to "inheritance as a result of *each* death in the child's family," is not limited to a death in her adoptive family,

but also includes the death of her natural father, Joseph. *Duran's Estate Br.* at 10 (emphasis added). Duran concludes that upon the occasion of each death in Duran's or Joseph's bloodline, the third sentence in Indiana Code section 29–1–2–8 gives her the right to inherit through that blood line. We disagree.

From its 1954 enactment, Section 208 of the Probate Code set forth the general rule that "a child legally adopted during his minority, . . . shall be treated the same as if he were the natural child of his adopting parents, and he shall cease to be treated as the child of his natural parents. . . ." Pub.L. 112–1953, § 208. This rule was uniquely suited to address intestate inheritance of a child who had been adopted by a non-family member. Undoubtedly recognizing that the general rule had the unintended result of severing the ties between a child and such child's natural parent when that parent married the child's adopting parent, the legislature included the first proviso.

Section 208 remained essentially unchanged following amendments in 1961 and 1965. In 1969, however, the legislature amended the statute to add the second proviso. Only one case of note was decided in the years between the 1965 and 1969 amendments. In 1965, our Supreme Court decided *Earle v. Indiana National Bank of Indianapolis.* In *Earle,* the facts were not in dispute. Everett Conn died intestate leaving three sisters and a brother as his nearest kin. *Earle,* 246 Ind. at 252, 204 N.E.2d at 653. Earle was Conn's natural brother, who, at age fifteen, had been adopted by his aunt and her husband. Earle's adoptive mother was the sister of Earle's natural father. When his adoptive parents died, Earle inherited from them as their child. Later, when Conn died, Earle filed a petition to determine heirship in Conn's estate. The trial court held that

Earle could not inherit from Conn as a brother.

Our Supreme Court recognized:[10]

It is within the province of the legislature to determine the rules of inheritance. No person has an inherent right to inherit property, and the lawmaking authority—the legislature—has the power to designate who shall inherit property.

246 Ind. at 253, 204 N.E.2d at 653. Analyzing the statute then in effect, the Court found that to treat Earle "as a brother of the children of his natural [father] would be to treat him as a child of his natural [father], in plain violation of [the] statute." 246 Ind. at 254, 204 N.E.2d at 654. The Supreme Court stated:

The intentions of the legislature seem plain to us. It says that when a minor child is adopted, such child, for purposes of inheritance, shall cease being the child of his natural parents. He does not inherit from them or their relatives and they do not inherit from him. He stands in a new legal relationship upon adoption. The old ties are broken. *Pointer et al. v. Lucas et al.*, 131 Ind. App. 10, 169 N.E.2d 196 (1960).

*Id.*

In 1969, the Indiana General Assembly added the second proviso, which read as follows:

Provided further, That if a person who is related to a child within the sixth degree adopts such child, such child shall upon the occasion of each death in his family have the right of inheritance through his natural parents or adopting parents, whichever is greater in value in each case.

Had this proviso been part of the law in 1965, our Supreme Court would have found Earle to be Conn's heir. We analyze the facts of *Earle* in light of the second proviso to determine its impact on this and other factually similar cases. Under the general rule of Indiana Code section 29–1–2–8, Earle's adoption caused him to cease being treated as the child of either his natural mother or father. This meant that he also ceased to be treated as Conn's brother, since that relationship arose through Earle's parents. The adoption of Earle by his father's sister, however, created new legal relationships within the adoptive family; Earle's natural father became his uncle and Earle's brother became Earle's cousin.

■ Under the language of the second proviso—"upon the occasion of each death in his family,"—Earle would have "the right of inheritance through [his] natural parents or adopting parents, whichever is greater in value in each case." I.C. § 29–1–2–8. Conn's death, being that of Earle's adoptive cousin, was a death within Earle's family. Under the second proviso, this triggering event would have given Earle a right of inheritance through his natural father or adopting mother, whichever was greater in value in each case. Through his natural father, Earle held the relationship to Conn of brother. Through his adopting mother, Earle was Conn's cousin. Inheritance in the role as brother would have resulted in the greater inheritance. Therefore, under the second proviso, Earle would have had the right, *through* his natural father, to inherit from Conn as a brother.

Noting the proximity of time and topic between our Supreme Court's decision in *Earle* and the General Assembly's amendment of Indiana Code section 29–1–2–8 to

---

**10.** The case came before the Supreme Court on a constitutional question that is not pertinent to this appeal.

include the second proviso, we are convinced that the second proviso was enacted to avoid unintentional disinheritance like that found in *Earle.* We find no support for Duran's assertion that the second proviso stands alone as a new rule that expands an adopted child's right to again inherit from her natural parents. Instead, we find that the second proviso merely carves out an exception to the general rule that an adopted child shall cease to be treated as the child of his natural parents under all scenarios of intestate inheritance.

With this in mind, we analyze the facts before us. At the event of Duran's adoption, the general rule of Indiana Code section 29–1–2–8 caused her relationships with Maria, her natural mother, and Joseph, her natural father, to be severed. The fact of being adopted by her maternal grandparents, however, reestablished Duran's relationship with Maria. Duran and Maria were now both children of Teodoro and Rachel Duran. In the new family, Maria was now Duran's sister. Duran's relationship with Joseph was severed and never reestablished. Joseph was no longer in Duran's family.

To modify the general rule, the second proviso must be triggered by the occurrence of two events: (1) a person related to the child within six degrees adopts the child; and (2) there must be a death in the child's family. While the first prong was satisfied by Teodoro and Rachel Duran's relationship with Duran, since Joseph's tie to Duran had been severed, there was no death "in the child's family." Here, the proviso was never triggered. Without the modification by the second proviso, Duran fell within the general rule and ceased to be treated as a child of her natural parent, Joseph. I.C. § 29–1–2–8. We agree with the trial court's determination that Duran is not Joseph's heir.[11]

### E. Inheritance Through and From

In her interlocutory appeal, Duran finally contends that it was error for the trial court to conclude that Indiana Code section 29–1–2–8, while allowing inheritance *through* a natural parent, precludes inheritance *from* a natural parent. *Id.* Duran reasons that the legislature could not have intended for her to inherit the property of paternal relatives **through** her father, but not **from** her father. This, Duran states, places unnecessary strain on the words "from" and "through," which perverts the intent of the statute. *Id.* at 13 (citing *Adams v. Slater,* 132 Ind.App. 105, 112, 175 N.E.2d 706, 709 (Ind.Ct.App.1961)). Finding as we do that Joseph's death did not trigger the second proviso, we need not address the meaning of those words within the proviso.

### III. Paternity

Baltasar raises two issues on appeal, the following of which we find dispositive: whether Baltasar is entitled to intervene in Duran's paternity action under Indiana Trial Rule 24. The trial court denied Baltasar's motion to intervene in the paternity action as a matter of right. Because there is neither common law nor statutory authority to allow the intervention that Baltasar sought, we agree.[12]

Intervention in an action as a matter of right is controlled by Indiana Trial Rule 24(A), which states, in relevant part:

(A) **Intervention of right.** Upon timely motion anyone shall be permitted to intervene in an action:

---

11. We commend the trial court on its extensive and well-reasoned order, which assisted greatly in our decision.

12. Baltasar does not raise the question of permissive intervention under T.R. 24(B); therefore, he seems to concede that in the absence of a right to intervene under T.R. 24(A)(2), the refusal of the trial court to permit intervention under T.R. 24(B) was not error.

(1) when a statute confers an unconditional right to intervene; or

(2) when the applicant claims an interest relating to a property, fund or transaction, which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect his interest in the property, fund or transaction, unless the applicant's interest is adequately represented by existing parties.

■ It has been proposed that the distinguishing feature between permissive intervention and that as of right "is that while an application for permissive intervention is directed to the discretion of the court, an application for intervention as of right seems to pose only a question of law." *Llewellyn v. Beasley,* 415 N.E.2d 789, 792 (Ind.Ct.App.1981) (citing 7A Wright & Miller, Federal Practice and Procedure § 1902 (1972)). "[S]uch an analysis appears to be an oversimplification. Determinations as to intervention as a matter of right under T.R. 24(A)(2) must be classed as a mixed question of law and fact." *Id.*

■ Intervention as of right is based on a three-part test. *In re Paternity of E.M.,* 654 N.E.2d 890, 892 (Ind.Ct. App.1995). The intervenor must demonstrate: (1) that he has an interest in the subject of the action; (2) that disposition in the action may as a practical matter impede protection of that interest; and (3) that representation of the interest by existing parties is inadequate. *Id.* Timeliness of the request is another factor which also must be considered, *Llewellyn,* 415 N.E.2d at 791, and the facts alleged in the intervener's motion must be taken as true. *In re E.M.,* 654 N.E.2d at 892. "Since there is little agreement among the trial courts about what precise facts or circumstances satisfy the three[-]part test for

intervention as a matter of right, the determination of whether the factual circumstances satisfy the test is committed to the discretion of the trial court." *Developmental Disabilities Residential Facilities Council v. Metro. Dev. Comm'n of Marion County, Ind.,* 455 N.E.2d 960, 964 (Ind.Ct. App.1983).

Following a hearing on Baltasar's motion to intervene, the paternity court issued a well-reasoned six-page order, which in pertinent part read:

Baltasar claims an interest in the paternity proceeding[.] This does not appear to meet the "immediate and direct" standard articulated in *Developmental. See Dev['t] Disabilities Residential Facilities Council,* 455 N.E.2d 960. Baltasar's interest more closely resembles an indirect and derivative interest, which case law expressly finds inadequate to support interventions. *See Valparaiso Technical Inst. [v. Porter County Treasurer,* 682 N.E.2d 819 (Ind.Ct.App. 1997)) ]. Baltasar also claims that "the only forum in which Baltasar may defend his interest in Joseph's Estate is through the paternity action." Baltasar may defend, and is defending his interest in the estate in the probate court. The probate court is where he has a direct and substantial interest. Consequently, Baltasar does not have the level of interest that Trial Rule 24(A) requires for intervention in the paternity proceeding. Equally compelling is that Indiana case law governing paternity actions gives Baltasar no standing in this proceeding. This is discussed next.

Under Indiana law, the required parties in a paternity action are the child, the mother, and the purported father(s). [I.C. § 31–14–5–6]. When the putative father is deceased, his personal representative represents his interests. ...

Baltasar does not claim to be the father or the personal representative of

Joseph's estate. It appears Baltasar wishes to intervene for the purpose of thwarting petitioner's effort to establish paternity in Joseph. In both *Lamey* [*v. Lamey*, 689 N.E.2d 1265 (Ind.Ct.App. 1997)] and [*In re*] *Long*, [804 N.E.2d 1176, 1181 (Ind.Ct.App.2004)] the court found that a third party, even an interested third party, did not have standing in the paternity action if he was not the personal representative and was not trying to establish paternity in himself.

. . .

The Court finds that the intervener must possess an immediate and direct interest in the proceeding. Baltasar's interest in this proceeding is only indirect and derivative. This interest is not sufficient grounds for intervention.

*Baltasar's Paternity App.* at 11–14.

On appeal, Baltasar claims that his interest in the paternity action arises as Joseph's guardian, his natural father, and as a potential heir to Joseph's estate. He again argues that "the only forum in which [he] can defend his interests in Joseph's estate with respect to whether Duran is Joseph's daughter is in this paternity action." *Baltasar Paternity Br.* at 18. Like the trial court, we find Baltasar's interests to be merely indirect and derivative of a paternity determination. Further, finding as we do that Duran is not Joseph's heir, it is clear that the paternity case was not the only forum in which Baltasar could defend his interests in Joseph's estate. The trial court did not abuse its discretion in denying Baltasar's motion to intervene in Duran's paternity action.

Affirmed.

ROBB, J., and BARNES, J., concur.