**Victor C. REGALADO, Appellant–Respondent,**

v.

**ESTATE OF Joseph J. REGALADO, and Paula Heffelfinger, Appellees–Petitioners.**

**No. 64A05–0911–CV–672.**

Court of Appeals of Indiana.

Aug. 27, 2010.

Patrick B. McEuen, David P. Matsey, Millbranth & Bush, Valparaiso, IN, Attorneys for Appellant.

Kristin L. Scheuerman, Valparaiso, IN, Attorney for Appellee, Paula Heffelfinger.

Hugo E. Martz, Martz, Clymer & Lucas, Valparaiso, IN, Attorney for Appellee, Personal Representative 1st Source Bank.

## OPINION

VAIDIK, Judge.

### Case Summary

Joseph James Regalado received a fifteen million dollar settlement from the City of Chicago in 2000 and died intestate in 2004. Because he left no surviving spouse or issue, his estate is to be distributed to his surviving parents, brothers, sisters, and issue of his deceased brothers and sisters. Victor Regalado, Joseph's brother, now appeals the Porter Superior Court's determination on summary judgment that Paula Heffelfinger is Joseph's half-sister. Joseph's father married Paula's mother in 2003, thirty-five years after Paula's birth. When the marriage was annulled in 2005, Joseph's father acknowledged Paula to be his biological child.

At issue is whether Indiana Code section 29–1–2–7(b), which governs the paternal inheritance to, through, and from a child born out of wedlock, applies to Paula such that she is an heir to Joseph's estate.

Specifically, subsection (b)(4) of the statute provides that a child born out of wedlock shall be treated as if the child's father were married to the child's mother at the time of the child's birth if the putative father marries the mother of the child and acknowledges the child to be his own. We hold that a child must show she is a child born out of wedlock before Section 29–1–2–7 is applicable and that there is a genuine issue of material fact as to whether Paula is a child born out of wedlock. We also hold that Joseph's father's acknowledgment of Paula as his biological daughter in the Agreed Order of Annulment does not preclude Joseph's father or any other heir from challenging his paternity of Paula. We thus conclude that the trial court erred in granting summary judgment in Paula's favor. We reverse and remand.

### Facts and Procedural History[1]

In 1991, Joseph suffered serious and permanent brain damage as the result of an altercation with officers of the Chicago Police Department. Joseph was thereafter adjudicated a disabled person, and his father, Baltasar Regalado, served as his guardian. On Joseph's behalf, Baltasar brought a federal lawsuit against the City of Chicago for the actions of its police officers, and in December 2000, the claim was settled for fifteen million dollars.

Baltasar and Joseph later moved to Porter County, Indiana, where Joseph died intestate in October 2004. At the time of his death, Joseph owned no real property but had eight to nine million dollars of personal property located in Indiana.[2] Because Joseph left no surviving spouse or issue, according to Indiana Code section 29–1–2–1(d)(3) his estate is to be distributed to his surviving parents, brothers, sisters, and issue of his deceased brothers and sisters.[3] A few days after Joseph's death, Baltasar filed a Petition for the Appointment of Administrator and for Supervised Administration, which listed himself as well as Joseph's brothers Chris, Martin, Victor, David, and Tony as Joseph's known heirs. The petition also listed among Joseph's known heirs Paula as his half-sister.[4]

Paula was born in October 1967 to Carmen Nadine Durea, who is not Joseph's mother. Carmen and Baltasar married in Arizona in April 2003, when Paula was thirty-five years old. During the marriage, Carmen lived in Arizona and Baltasar lived in Indiana. Baltasar instituted annulment proceedings in Indiana in 2005. In the proceedings, Baltasar and Carmen signed an Agreed Order of Annulment, the preface of which states, "The subject matter of this Agreement is the settlement of the respective rights of Husband and Wife to all property, both real and personal, now in their name and/or possession, and any property which may come into their possession as a result of inheritance." Appellant's App. p. 70. Within the Agreed

---

**1.** We held oral argument in the Indiana Court of Appeals' courtroom at the Statehouse on August 4, 2010.

**2.** At oral argument, 1st Source Bank, the personal representative of Joseph's estate, indicated that the estate currently consists of $4.2 or $4.3 million because of federal and state tax payments.

**3.** In January 2009, another panel of this Court held that Maria E. Duran, Joseph's biological daughter born out of wedlock, was not entitled to inherit from Joseph's estate because her adoption by her maternal grandparents severed her relationship with Joseph. *In re Paternity of Duran*, 900 N.E.2d 454, 466 (Ind.Ct.App.2009), *reh'g denied*.

**4.** The petition additionally listed Duran as Joseph's alleged daughter but asserted that her adoption by her maternal grandparents foreclosed the claim that she is an heir to Joseph's estate. Appellant's App. p. 65.

Order of Annulment, Baltasar acknowledged Paula as his biological daughter: "Both parties readily acknowledge that Paula Heffelfinger is their natural daughter, fathered by the Petitioner and born to the Respondent on October 13, 1967." *Id.* The trial court entered an Order of Annulment in November 2005.

In October 2008, Victor filed a Petition to Determine Heirship, which alleged that Paula was not Joseph's half-sister and requested a hearing on the matter. Paula filed a motion for summary judgment and included in her designation of evidence: (1) Baltasar's unsworn July 2003 Petition for Leave to Make Gifts in Guardianship, which identifies Paula as Joseph's sister; (2) Baltasar's sworn October 2004 Petition for the Appointment of Administrator and for Supervised Administration, which identifies Paula as Joseph's half-sister; (3) Baltasar's October 2003 birthday card to Paula, which is signed, "YOUR DAD B.E.R."; (4) Baltasar and Carmen's November 2005 Order of Annulment and Agreed Order of Annulment, in which Baltasar acknowledges Paula as his biological daughter; and (5) a March 2007 Siblingship Report stating that Paula and Tony have a 98.1% probability of being half-siblings.

Victor filed a response to Paula's motion for summary judgment contending that Paula had failed to conclusively establish that Baltasar is her biological father.[5] He designated no evidence. After a hearing, the trial court entered its order finding Paula to be a sibling of Joseph and thus granting her motion for summary judgment.

Victor filed a motion to correct error, and Paula filed a response to his motion. Victor then filed two affidavits. In one affidavit, Baltasar stated that he mistakenly believed he was Paula's father because Carmen informed him that he was listed as such on her birth certificate, but he recently requested a copy of the birth certificate and discovered he was not listed on it. In the other affidavit, Victor stated that Baltasar was not listed on Paula's birth certificate.

Victor's motion to correct error was denied after a hearing. He now appeals.

## Discussion and Decision

Victor contends that the trial court erred in granting Paula's motion for summary judgment. However, because Paula asserts that Victor's affidavits are untimely, we first determine whether we may consider them.

### I. Affidavits

Paula contends that Victor's affidavits are untimely. Paula filed her motion for summary judgment and accompanying designation of evidence on March 23, 2009. Victor responded with a memorandum of law on April 14, 2009, but designated no evidence. After the trial court granted Paula's motion for summary judgment on July 27, 2009, Victor filed a motion to correct error on August 21, 2009. His motion did not allege any newly discovered evidence. It was not until September 30, 2009, the day of the hearing on the motion to correct error, that Victor filed the affidavits.

It is unclear whether Victor filed the affidavits as designated evidence on summary judgment or as part of his motion to

---

5. Tony also filed a response to Paula's motion for summary judgment. He argued that Paula's motion should be stricken because the trial court's jurisdiction was held in abeyance pending the ruling on Duran's petition for rehearing (and transfer to the Indiana Supreme Court, if sought) since the issue of Paula's heirship would be moot if Duran was found to be a legitimate heir. In the alternative, he requested additional time for discovery regarding the possibility that Paula is Joseph's cousin and not sibling.

correct error. We conclude that in either case, we may not consider them.

■ Indiana Trial Rule 56, which governs summary judgment proceedings, provides that "[a]n adverse party shall have thirty (30) days after service of the motion to serve a response and any opposing affidavits." Ind. Trial Rule 56(C). It also provides, "For cause found, the Court may alter any time limit set forth in this rule upon motion made within the applicable time limit." T.R. 56(I). When a nonmoving party fails to respond to a motion for summary judgment within thirty days by either filing a response, requesting a continuance under Trial Rule 56(I), or filing an affidavit under Trial Rule 56(F), the trial court cannot consider summary judgment filings of that party subsequent to the thirty-day period. *Borsuk v. Town of St. John*, 820 N.E.2d 118, 123 n. 5 (Ind. 2005).

■ Victor filed a response with no designated evidence within thirty days of Paula's motion for summary judgment. At the time of the filing, he did not seek an extension of time to designate evidence. Moreover, he failed to file the affidavits until after the trial court granted summary judgment. We conclude that the affidavits, if filed as a designation on summary judgment, were untimely filed.

■ The result is the same if we consider Victor's affidavits as newly discovered evidence in his motion to correct error. Indiana Trial Rule 59(A)(1) provides that a motion to correct error is a prerequisite for appeal when a party seeks to address "[n]ewly discovered material evidence ... capable of production within thirty (30) days of final judgment which, with reasonable diligence, could not have been discovered and produced at trial." To prevail on a motion to correct error based on newly discovered evidence, Victor needed to demonstrate that the evidence could not have been discovered and produced at the summary judgment proceedings with reasonable diligence; that the evidence is material, relevant, and not merely cumulative or impeaching; that the evidence is not incompetent; that he exercised due diligence to discover the evidence in time for the final hearing; that the evidence is worthy of credit; and that the evidence raises a strong presumption that a different result would have otherwise been reached. *See Matzat v. Matzat*, 854 N.E.2d 918, 920 (Ind.Ct.App.2006).

Victor failed to set forth any of these factors in his affidavits. He was required to do so. *See Johnson v. Rutoskey*, 472 N.E.2d 620, 623 (Ind.Ct.App.1984) (no error where trial court refused to consider purchaser's affidavit in support of motion to correct error where purchaser failed to assert that evidence it contained was newly discovered). Moreover, given that the issue on summary judgment was whether Paula was Baltasar's biological daughter and thus an heir to Joseph's estate, information contained in her birth certificate could have been produced, with reasonable diligence, during the summary judgment proceedings. We conclude that we may not consider Victor's affidavits.

## II. Summary Judgment

Victor contends that the trial court erred in granting Paula's motion for summary judgment. The law of summary judgment is well established. The purpose of summary judgment is to terminate litigation about which there can be no factual dispute and which may be determined as a matter of law. *Bushong v. Williamson*, 790 N.E.2d 467, 474 (Ind.2003). Our standard of review is the same as that of the trial court: summary judgment is appropriate only where the evidence shows there is no genuine issue of material fact and the moving party is entitled to judg-

ment as a matter of law. T.R. 56(C); *Williams v. Riverside Cmty. Corr. Corp.*, 846 N.E.2d 738, 743 (Ind.Ct.App.2006), *trans. denied.* Our review of a summary judgment motion is limited to those materials designated to the trial court. *Mangold ex rel. Mangold v. Ind. Dep't of Natural Res.*, 756 N.E.2d 970, 973 (Ind.2001). The party seeking summary judgment bears the burden of showing that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. *Dreaded, Inc. v. St. Paul Guardian Ins. Co.*, 904 N.E.2d 1267, 1270 (Ind.2009). Once the movant has done this, the burden shifts to the nonmovant to make a showing sufficient to establish the existence of a genuine issue for trial. *Butler v. City of Peru*, 733 N.E.2d 912, 915 (Ind.2000). If the movant does not satisfy the burden, then summary judgment is precluded regardless of whether the nonmovant designates facts and evidence in response to the movant's motion. *Monroe Guar. Ins. Co. v. Magwerks Corp.*, 829 N.E.2d 968, 975 (Ind.2005). We construe all factual inferences in the nonmovant's favor and resolve all doubts as to the existence of a material issue against the movant. *Dreaded*, 904 N.E.2d at 1270.

▇ Paula's summary judgment motion sought a determination of her legitimacy as an heir to Joseph's estate as his half-sister. The burden of proof rests on Paula as a child who alleges that she is an illegitimate child entitled to inherit from or through her putative father. *See Green v. Estate of Green*, 724 N.E.2d 260, 264 (Ind. Ct.App.2000). Paula contends she has met this burden by showing that Baltasar married her mother Carmen and acknowledged Paula as his biological child. Victor contends that such a showing is insufficient because she has not first shown that she is a child born out of wedlock.

Indiana Code section 29–1–2–7, which governs the intestate succession of children born out of wedlock, states:

(b) For the purpose of inheritance (on the paternal side) to, through, and from a *child born out of wedlock,* the child shall be treated as if the child's father were married to the child's mother at the time of the child's birth, if one (1) of the following requirements is met:

(1) The paternity of a child who was at least twenty (20) years of age when the father died has been established by law in a cause of action that is filed during the father's lifetime.

(2) The paternity of a child who was less than twenty (20) years of age when the father died has been established by law in a cause of action that is filed:

(A) during the father's lifetime; or

(B) within five (5) months after the father's death.

(3) The paternity of a child born after the father died has been established by law in a cause of action that is filed within eleven (11) months after the father's death.

(4) *The putative father marries the mother of the child and acknowledges the child to be his own.*

(5) The putative father executes a paternity affidavit as set forth in IC 16–37–2–2.1.

(Emphases added). Under subsection (b)(4), in order to inherit through the paternal side, a child born out of wedlock must show that the putative father married the mother of the child and acknowledged the child as his own. Thus, we determine whether Paula has met her burden of proving that she is entitled to inherit from Joseph's estate under subsection (b)(4).

As an initial matter, Victor argues that Paula should not be permitted to establish paternity through Section 29–1–2–7(b) when she is barred from filing a paternity action through Indiana Code section 31–14–5–2(b), which provides that a child generally may file a paternity petition at any time before she reaches twenty years of age. *See* Appellant's Br. p. 13–14. We have previously resolved this very issue. *See Woods v. Harris,* 600 N.E.2d 163 (Ind.Ct.App.1992). In *Woods,* a forty-eight-year-old woman filed a petition to establish paternity in a man who died intestate. *Id.* at 163. The trial court determined that her petition was barred because of her failure to establish paternity before her twentieth birthday. *Id.* at 164. On appeal, this Court concluded that the trial court erred in dismissing the petition, stating that the time limitations for a child to file a paternity action are inapplicable to statutes relating to proof of heirship and inheritance rights because they are not *in pari materia. Id.See generally* Black's Law Dictionary 807 (8th ed. 2004) ("It is a canon of construction that statutes that are *in pari materia* may be construed together, so that inconsistencies in one statute may be resolved by looking at another statute on the same subject."). We draw the same conclusion here. Section 31–14–5–2, relating to children filing paternity actions, and Section 29–1–2–7, relating to inheritance rights, are not based on the same subject matter and thus cannot be construed together. Victor's argument in this regard fails.

### A. Marriage and Acknowledgment

Pursuant to subsection (b)(4), Paula must show that Baltasar married her mother and acknowledged Paula as his own. Neither party disputes the fact that Baltasar and Carmen married in April 2003. Consequently, we need only determine whether Baltasar acknowledged Paula as his daughter.

This Court has found sufficient evidence of acknowledgment where the evidence included an affidavit signed by the decedent almost a year and a half after the child's birth acknowledging him to be his son, a life insurance application in which the decedent identified himself as the child's father, a dissolution petition in which the decedent listed the child as his son, a pension plan application in which the decedent listed the child as a contingent beneficiary and identified him as his son, and a medical expense plan enrollment form where the decedent listed the child as his son. *Green v. Estate of Green,* 724 N.E.2d 260, 265 (Ind.Ct.App.2000). We have also found sufficient evidence of acknowledgment where witnesses have testified that the decedent held the child out to be his own in statements he made to them. *See Horner v. Boomershine,* 88 Ind.App. 57, 59–61, 161 N.E. 641, 642 (1928); *Townsend v. Meneley,* 37 Ind.App. 127, 132–33, 74 N.E. 274, 275–76 (1905), *reh'g denied, trans. denied.*

Here, the designated evidence shows that Baltasar identified Paula as Joseph's sister in his unsworn July 2003 Petition for Leave to Make Gifts in Guardianship and sworn October 2004 Petition for the Appointment of Administrator and for Supervised Administration. He also sent Paula a birthday card dated October 2003, which he signed, "YOUR DAD B.E.R." And in Baltasar and Carmen's November 2005 Agreed Order of Annulment, he acknowledged Paula as his biological daughter. We conclude that this designated evidence is sufficient to show that Baltasar acknowledged Paula as his biological daughter.

To the extent Victor claims that Baltasar's acknowledgment of Paula "was tainted by misrepresentations and misin-

formation from Paula's mother Carmen," Appellant's Br. p. 7, we have already concluded that we may not consider Victor's affidavits, and thus there is no information in the record to support his assertion.

### B. Child Born Out of Wedlock

Victor contends that Paula must show she is a child born out of wedlock and that her failure to make such a showing renders the grant of summary judgment improper. Paula does not explicitly contest that such a showing is necessary but instead assumes she is a child born out of wedlock, *see* Appellee's Br. p. 9 ("Paula is the illegitimate child of Baltasar and Carmen, therefore her ability to inherit from Joseph's intestacy estate is governed by Indiana Code 2[9]–1–2–7."), and then asserts that Baltasar married her mother and acknowledged Paula as his daughter.

Indiana cases support the proposition that a child must show she is born out of wedlock in order to apply Section 29–1–2–7(b). In *Green v. Estate of Green*, 724 N.E.2d 260 (Ind.Ct.App.2000), a child sought to prove he was the decedent's son and entitled to inherit. The child's mother was married at the time the child was born, but her husband was not the decedent. *Id.* at 262. The record showed that the decedent married the child's mother a little over a year after the child's birth and that he acknowledged the child as his son pursuant to Indiana Code section 29–1–2–7(b). *Id.* at 263, 265. The *Green* Court first recognized that the fact that the child's mother was married at the time the child was born created a presumption that the mother's husband at the time was the child's father. *Id.* at 264–65. Thereafter, the Court found the decedent's subsequent marriage to the child's mother and acknowledgment of the child as well as other evidence in the record to be sufficient evidence to rebut the presumption that the

mother's husband at the time the child was born was the child's father; thus, the child was entitled to inherit from the decedent. *Id.* at 265. In so deciding, the Court implicitly determined that the child was born out of wedlock.

*In re Schick's Estate*, 149 Ind.App. 549, 274 N.E.2d 291 (1971), also supports the proposition that a child must show she is born out of wedlock in order to apply Section 29–1–2–7(b). As in *Green*, *Schick's Estate* involved a child who sought to prove he was entitled to inherit from the decedent. This Court found that despite the decedent's acknowledgement of the child as his son, the child could not inherit from the decedent where there was no proof that the decedent was his biological father or that he ever married his biological mother. *Id.* at 568, 274 N.E.2d at 301–02; *see also Horner v. Boomershine*, 88 Ind.App. 57, 58, 161 N.E. 641, 641 (1928) (where statute at the time did not require showing of marriage, establishment of both illegitimacy and acknowledgment necessary in order for illegitimate daughter to inherit from father).

We did not reach the issue in *Tekulve v. Turner*, where a child presented evidence that the decedent acknowledged her as his biological child. 181 Ind.App. 295, 297, 391 N.E.2d 673, 676 (1979). Because the child alleged only acknowledgment but not marriage, this Court affirmed the trial court's summary judgment determination that the child was not an heir of the decedent. *Id.* at 297–98, 391 N.E.2d at 676. The Court did not discuss whether the child had to show she was born out of wedlock, but it had no need to resolve the issue as the failure to establish that the decedent married the child's mother precluded her claim.

Although these cases appear to support a claim that a child must show she is born out of wedlock before application of Sec-

tion 29–1–2–7(b), in none of these cases was the Court explicitly asked to resolve this issue. Thus, this case presents an issue of first impression.

■ When interpreting a statute, our primary goal is to determine and give effect to the intent of the legislature. *Porter Dev., LLC v. First Nat'l Bank of Valparaiso,* 866 N.E.2d 775, 778 (Ind.2007). We ascertain legislative intent by the language of the statute. *Estate of Chiesi v. First Citizens Bank, N.A.,* 604 N.E.2d 3, 5 (Ind. Ct.App.1992), *opinion adopted by* 613 N.E.2d 14 (Ind.1993). In this instance, Section 29–1–2–7 is titled, "Illegitimate children; inheritance." Further, subsection (b) enumerates when a child will be treated as if her father were married to her mother at the time of her birth "[f]or the purpose of inheritance (on the paternal side) to, through, and from a *child born out of wedlock.*" (Emphasis added). We conclude that the plain language of Section 29–1–2–7 requires a child to show she is a child born out of wedlock.

■ Under Indiana common law, the term wedlock refers to the status of the biological parents of the child in relation to each other. *K.S. v. R.S.,* 669 N.E.2d 399, 402 (Ind.1996). Thus, a child is born out of wedlock if: (1) the mother is unmarried when the child is born or (2) the mother is married when the child is born, but the mother's husband is not the child's biological father. *See id.* The legislature is presumed to know the common law and to incorporate it into the statute except where it expressly indicates otherwise. *Bailey v. Manors Group,* 642 N.E.2d 249, 252 (Ind.Ct.App.1994), *reh'g denied, trans. denied.* Here, the legislature has not expressly indicated in Section 29–1–2–7(b)

any intent contrary to the common law. Thus, we apply the common law definition of born out of wedlock.

■ Paula has not designated evidence showing Carmen's marital status at the time of Paula's birth. As a result, she has not shown that she is a child born out of wedlock by virtue of the fact that her mother was unmarried at the time of her birth. This is not necessarily fatal to her claim of heirship, however. Because it is undisputed that Carmen and Baltasar were not married to each other when Paula was born, if Baltasar is Paula's biological father, then Paula is a child born out of wedlock.[6]

The designated evidence shows that Baltasar did not acknowledge Paula as his daughter until she was thirty-five years of age. Specifically, he identified Paula as Joseph's sister in an unsworn July 2003 petition filed in Joseph's guardianship and in a sworn October 2004 Petition for the Appointment of Administrator and for Supervised Administration of Joseph's estate. Baltasar also sent a birthday card to Paula in October 2003, which he signed, "YOUR DAD B.E.R.," and acknowledged Paula as his biological daughter in his and Carmen's November 2005 Agreed Order of Annulment.

In addition to these acknowledgements, Paula designated a March 2007 Siblingship Report stating that Paula and Tony have a probability of relatedness of 98.1%. We conclude that the evidence designated is insufficient to prove as a matter of law that Baltasar is Paula's biological father.

First, Baltasar's acknowledgement of Paula does not alone establish him as her

---

**6.** Had Paula designated evidence that her mother was unmarried at the time of her birth, then that evidence would have been sufficient to show that she is a child born out of wedlock. In such a case, she would not have been required to show that Baltasar is her biological father.

biological father. This determination may initially appear incongruous with *Green,* where the child was entitled to inherit from the decedent, but *Green* is distinguishable. 724 N.E.2d 260. In that case, the child's half-sister, who did not want the child to inherit, cited *Cooper v. Cooper,* 608 N.E.2d 1386, 1387 (Ind.Ct.App.1993), for the proposition that the presumption that the husband of the child's mother at the time of the child's birth was the child's father could be rebutted only with evidence that the husband was impotent, absent so as to have no access to the mother, absent or sterile during the entire time the child must have been conceived, present with the mother only in circumstances which clearly prove there was no sexual intercourse, or excluded as the child's father based upon blood grouping test results. *Id.* at 264–65. The *Green* Court rejected this reading of *Cooper,* concluding that the factors listed were not exclusive but merely provided examples of the type of evidence needed to rebut the presumption of paternity. *Id.* at 265. It then determined that the evidence presented rebutted the presumption that the mother's husband at the time of the child's birth was the child's father. *Id.*

We agree with *Green* that factors listed in *Cooper* are nonexhaustive. However, *Green* is distinguishable from this case because the decedent in *Green* did more than marry the child's mother and acknowledge the child. The evidence also showed that the decedent and the child's mother changed the child's last name on his birth certificate, and the birth certificate further reflected that the decedent was the child's father. Moreover, the de-cedent lived with the child and his mother and helped raise him since he was one year old. These factors are not present in this case. Here, we have marriage and but a bare acknowledgement of paternity. We hold that this is insufficient to establish as a matter of law that Baltasar is Paula's biological father.

Second, as to the Siblingship Report, we note that Indiana Code section 31–14–7–1(3), which is instructive but not controlling, provides that a man is presumed to be a child's biological father if he undergoes a genetic test that indicates with at least a 99% probability that the man is the child's biological father. The genetic test here does not compare the DNA of Paula and Baltasar to determine the probability of paternity; rather, it compares the DNA of Paula and Tony to determine the probability that they are half-siblings.[7] Moreover, even if the genetic test had compared the DNA of Paula and Baltasar and indicated a 98.1% probability of paternity, that percentage does not meet the requisite 99% probability necessary to create the presumption that Baltasar is Paula's biological father. We determine that the designated evidence is insufficient to show that Baltasar is Paula's biological father. Thus, Paula has not designated sufficient evidence to show that there is no material issue that she is a child born out of wedlock.

### C. *Agreed Order of Annulment*

█ As an alternative argument, Paula contends that Baltasar's acknowledgement of her as his biological daughter in his and Carmen's November 2005 Agreed Order of Annulment is definitive in establishing pa-

---

7. Further, the Siblingship Report indicates that there is only moderate support for the hypothesis that Paula and Tony are half-siblings. *See* Appellant's App. p. 75–76 (combined likelihood ratio of 51.700 means Paula and Tony "are 51.7 times more likely to be related as Half Siblings than to be unrelated," and cumulative likelihood ratio between 10 and 100 indicates "Moderate support" for hypothesis that Paula and Tony are half-siblings).

ternity.[8] Paula states that the Agreed Order of Annulment "establishes Paula's paternity in Baltasar and is just as binding as a dissolution decree." Appellee's Br. p. 12. We construe her argument as contending that Baltasar's acknowledgment of her as his biological daughter in the Agreed Order of Annulment alone precludes Baltasar or any other heir from challenging her paternity in Baltasar. Although Paula does not explicitly present it as such, her argument sounds in collateral estoppel.

■■■■■■ Collateral estoppel bars subsequent litigation of a fact or issue which was adjudicated in previous litigation if the same fact or issue is presented in a subsequent lawsuit. *Fitz v. Rust–Oleum Corp.,* 883 N.E.2d 1177, 1182 (Ind.Ct.App.2008), *reh'g denied, trans. denied.* The former adjudication will be conclusive in the subsequent action even if the two actions are on different claims. *Id.* However, the former adjudication will be conclusive only as to those issues which were actually litigated and determined therein. *Id.* A two-part analysis determines whether collateral estoppel should be employed in a particular case: (1) whether the party against whom the former adjudication is asserted had a full and fair opportunity to litigate the issue and (2) whether it would be otherwise unfair under the circumstances to permit the use of collateral estoppel in the current action. *Id.* at 1182–83.

■■■ In determining the applicability of collateral estoppel here, we first observe that the inquiry into whether a child is a child of the marriage is a determination by the dissolution court of who the child's parents are for purposes of custody, visitation, and support. *Russell v. Russell,* 682 N.E.2d 513, 517 (Ind.1997). Parties to a dissolution may stipulate or otherwise explicitly or implicitly agree that a child is a child of the marriage. *Id.* at 518. In such a case, "although the dissolution court does

---

**8.** We decline to address the Agreed Order of Annulment under our Section 29–1–2–7(b) analysis. Paula asserts, "For purposes of inheritance an illegitimate child may inherit to, through, and from a putative father, so long as (1) the paternity of such child has been established by law, during the father's life time; or (2) if the putative father marries the mother of the child and acknowledges the child to be his own." Appellee's Br. p. 9 (citations omitted). As to the first prong, Paula argues that Baltasar's acknowledgment of her in the Agreed Order of Annulment shows that her paternity has been established by law during Baltasar's lifetime. It appears that Paula relies on an older version of the statute, which provides:

(b) For the purpose of inheritance (on the paternal side) to, through, and from a child born out of wedlock, the child shall be treated as if the child's father were married to the child's mother at the time of the child's birth, if:

(1) the paternity of the child has been established by law in a cause of action that is filed:

(A) during the father's lifetime; or

(B) within five (5) months after the father's death; or

(2) the putative father marries the mother of the child and acknowledges the child to be his own.

Ind.Code § 29–1–2–7(b) (1998). "The interest of an acknowledged illegitimate child in a decedent's estate is contingent upon his survivorship of the decedent and is governed by the law applicable ... to intestate succession by illegitimates in force and effect at the time of decedent's death." *Schick's Estate,* 149 Ind.App. at 563, 274 N.E.2d at 299. The current version of the statute was in effect at the time of Joseph's death in October 2004. Because subsections (b)(1), (2), and (3) of the current version require the child's father to have died while the older version does not, they are wholly inapplicable here.

Nonetheless, we address the implications of the Agreed Order of Annulment because of the line of cases that determine that a husband may not contest paternity where he acknowledges in a dissolution action that a child is his biological child. *See, e.g., Russell v. Russell,* 682 N.E.2d 513, 518 (Ind.1997).

not identify the child's biological father, the determination is the legal equivalent of a paternity determination in the sense that the parties to the dissolution—the divorcing husband and wife—will be precluded from later challenging that determination, except in extraordinary circumstances." *Id.*; *see also Eytchison v. Burgess,* 581 N.E.2d 976, 977 (Ind.Ct.App.1991) (where divorcing husband never raised question of paternity in dissolution proceedings and trial court established husband as father of children in dissolution decree, husband cannot later collaterally attack such finding through a petition to determine legitimacy).

The preclusive effect of such a determination on divorced parties has been noted in the context of an heirship determination. *Estate of Lamey v. Lamey,* 689 N.E.2d 1265 (Ind.Ct.App.1997), *trans. denied.* In *Lamey,* the mother and the decedent were married when their child V.L. was born, but they divorced almost ten years later. *Id.* at 1266. After the decedent died intestate, his brother, who had arranged for a sample of the decedent's blood to be taken and preserved following his death, filed a petition to determine heirship and requested blood tests to determine whether V.L. was the biological child of the decedent. *Id.* at 1266–67 & n. 2. The trial court granted the request, and the mother instituted an interlocutory appeal. *Id.* at 1267. This Court reversed, finding that the presumption that the decedent was V.L.'s biological father became irrefutable upon his death. *Id.* at 1268. It also pointed out that the mother and the decedent had explicitly agreed to a finding

in the dissolution decree that V.L. was a child born of the marriage. *Id.* at 1269. Thus, the decedent's brother, who had no standing under Indiana's paternity statutes to establish or disestablish V.L.'s paternity, was attempting to challenge the decedent's paternity of V.L. when the decedent himself would be precluded from doing so if he were still alive.[9] *Id.* at 1268–69.

*Lamey* is distinguishable from this case. In *Lamey,* V.L. was nine years old when her mother and the decedent divorced. The dissolution court was thus required to determine that V.L. was a child of the marriage before it could order custody, visitation, and support. V.L.'s mother and the decedent explicitly agreed to a finding contained in the dissolution decree that V.L. was a child born of the marriage.

The situation here is different. The preface to the Agreed Order of Annulment defines its subject matter as property settlement. Indeed, our review of the Agreed Order of Annulment comports with this. However, within the document, Baltasar and Carmen acknowledge that Paula is their biological daughter. Unlike V.L. in *Lamey,* Paula was thirty-eight years old and emancipated at the time of the annulment. Here, the parties' acknowledgment of Paula is gratuitous not only because the subject matter of the agreement, self-defined by the parties, is property settlement, but more importantly, because the annulment court did not and will never determine issues of custody, visitation, and support for Paula.

---

9. Victor states that "the *Lamey* Court refused to define the second subset of 'illegitimate children', born into an intact marriage but not fathered by husband, as children 'born out of wedlock' in estate proceedings." Appellant's Reply Br. p. 8. This statement is misleading. Whether a child born to a moth- er married to a husband who is not the child's biological father falls within the purview of Section 29–1–2–7(b) was not even before the Court because the decedent's brother could not challenge the decedent's presumptive fatherhood.

Under these facts, we conclude that Paula's paternity was not determined by the court in the annulment proceedings because the issue was never germane to the action, unlike in *Lamey*. That is, it is unfair under the circumstances presented here to permit the use of collateral estoppel in this case to prevent Baltasar or any other heir from challenging Paula's paternity in Baltasar. Baltasar's agreement that Paula is his biological daughter in the Agreed Order of Annulment thus does not establish that he is her biological father.

We determine that there is a genuine issue of material fact as to whether Baltasar is Paula's biological father and thus conclude that the trial court erred in granting summary judgment in Paula's favor.

Reversed and remanded.

NAJAM, J., and BROWN, J., concur.